IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

LINDA F. MOSLEY                    )
                                   )
v.                                 )    No. 2:05-0063
                                   )    Judge Nixon/Brown
JO ANNE B. BARNHART, Commissioner  )
of Social Security                 )

To:  The Honorable John T. Nixon, Senior Judge

## REPORT AND RECOMMENDATION

        This is a civil action filed pursuant to 42 U.S.C. §
405(g), to obtain judicial review of the final decision of the
Commissioner of Social Security denying plaintiff disability
insurance benefits (DIB), as provided under Title II of the
Social Security Act, as amended.  The case is currently pending
on plaintiff's motion for judgment on the administrative record
(Docket Entry No. 16), to which defendant has responded (Docket
Entry No. 22).  For the reasons stated below, the Magistrate
Judge recommends that plaintiff's motion be DENIED; that the
decision of the Commissioner be MODIFIED to reflect a finding of
"not disabled" based upon the testimony of the vocational expert
and the framework of Medical-Vocational rules 202.14 and 202.21;
and that the Commissioner's decision be AFFIRMED as modified.

1

## I. Introduction

Plaintiff filed her DIB application on July 24, 2002, alleging disability as of August 30, 1997, due to carpal tunnel syndrom (CTS), back problems, heart murmur, asthma, emphysema, arthritis, and depression (Tr. 22). Her application was denied at the initial and reconsideration levels of state agency review (Tr. 21). Plaintiff thereafter requested a *de novo* hearing before an Administrative Law Judge (ALJ).

On February 10, 2004, plaintiff appeared with counsel and testified before the ALJ, who also called a vocational expert (VE) to testify (Tr. 514-537). Plaintiff's daughter-in-law also appeared and testified on her behalf. On April 14, 2004, the ALJ issued a written decision denying plaintiff's claim for benefits (Tr. 18-28). The ALJ made the following findings:

1. The claimant met the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and was insured for benefits only through December 31, 2000.

2. The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3. The claimant's obesity, carpal tunnel syndrome, anxiety/depression are considered "severe" based on the requirements in the Regulations 20 CFR § 404.1520(c).

4. These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5. The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

2

6.  The claimant has the following residual functional capacity: light exertional activity avoiding excessive stress and frequent bending and stooping.

7.  The claimant is unable to perform any of her past relevant work (20 CFR § 404.1565).

8.  The claimant is a "younger individual between the ages of 45 and 49" and then "approaching advanced age" (20 CFR § 404.1563).

9.  The claimant has "a limited education" with additional training in cosmetology (20 CFR § 404.1564).

10. The claimant has no transferable skills from past work (20 CFR § 404.1568).

11. The claimant has the residual functional capacity to perform a restricted range of light work (20 CFR § 404.1567).

12. Based on an exertional capacity for a restricted range of light work and the claimant's age, education, and work experience, a finding of "not disabled" is directed by the framework of Medical-Vocational Rule 202.14 and 202.21.

13. The claimant was not under a "disability" as defined in the Social Security Act, at any time through December 31, 2000 (20 CFR § 404.1520(g)).

(Tr. 27).

On May 4, 2005, the Appeals Council denied plaintiff's request for review (Tr. 6-8), thereby rendering the ALJ's decision the final decision of the Commissioner. This civil action was thereafter timely filed, and the Court has jurisdiction. 42 U.S.C. § 405(g). If the Commissioner's findings are supported by substantial evidence, based on the record as a whole, then these findings are conclusive. Id.

3

## II.  Review of the Record

The following brief summary of the record of plaintiff's impairments is taken from defendant's brief (Docket Entry No. 22, pp. 3-5), and limited to the period of plaintiff's insurance for benefits.

The period at issue runs from plaintiff's alleged onset date, August 30, 1997, through plaintiff's date last insured, December 31, 2000 (Tr. 21-22).  During this period, plaintiff had multiple orthopedic complaints that doctors addressed (Tr. 23, 196, 200-02, 226, 240-42).  In 1999, she complained of back pain with normal neurological findings.  Doctors suggested the possible cause of her pain was early pyelonephritis, which is an inflammation of the kidney and pelvis caused by bacterial infection (Tr. 23, 196, 226).  Treatment with an antibiotic apparently resolved the pyelonephritis (Tr. 226).  She had some chronic pain in her right heel, but the podiatrist she saw about it did not recommend any treatment, and an examination in December 1997 revealed only mild tenderness in the right foot (Tr. 230).

Plaintiff testified that she was first diagnosed with carpal tunnel syndrome (CTS) in 1986 (Tr. 518).  Studies taken in 2000 revealed medical signs of CTS, including positive Tinel's sign and Phalen's sign of the right wrist and positive Phalen's of the left wrist (Tr. 23, 252).  Electromyography (EMG) and

4

nerve conduction studies confirmed moderately severe CTS in the
right wrist and mild CTS in the left wrist (Tr. 23, 252-53, 316).
On April 12, 1999, plaintiff complained of increased numbness and
weakness in her hands, as well as left elbow pain, and on
examination Tinel's signs were observed bilaterally, though
neither hand displayed any sensory or motor deficit (Tr. 227).
Plaintiff also complained of shoulder and neck problems (Tr. 23,
253, 519).  Medical evidence from 2000 shows fairly good neck
range of motion without radicular symptoms, good shoulder motion,
and only some elbow tenderness (Tr. 23, 253).  Medical records do
not indicate surgery during the relevant time period (Tr. 23,
252-53).

Plaintiff has also complained of chest pains and a
heart murmur (Tr. 23, 212-13, 224, 520-21).  Office notes and
physicians' reports reveal that plaintiff has consistently had
regular rate and rhythm, with no murmurs, gallops, or rubs (Tr.
23, 214, 224, 227, 228).  EKG's and cardiac examinations have
returned normal (Tr. 23, 209, 215-16, 217-19).  Chest x-rays in
1998, 1999, and 2000 reveal no cardiac problems (Tr. 182, 242,
298).

Plaintiff complained of breathing problems, frequent
bronchitis, and an inability to use chemicals in cleaning her
house (Tr. 24, 521, 524).  The record includes evidence of
emergency room visits where plaintiff complained of breathing

5

problems (Tr. 24, 206-07, 209, 294-97).  However, chest studies returned normal, demonstrating clear lungs and no evidence of wheezing, rales or rhonchi (Tr. 24, 208, 209, 222, 223, 227, 228).  Chest x-rays in 1998, 1999, and 2000 revealed that plaintiff's lungs were clear (Tr. 182, 242, 296).

Plaintiff reported a history of depression (Tr. 24, 516).  Medical records dated in 1996 show a problem with anxiety and depression and, in 1997, note some depression and stress associated with starting a business (Tr. 24, 230).  In 1998, one treating physician record noted an increase in anxiety, nervousness, and depression, when plaintiff had apparently run out of her Prozac; her Prozac dosage was increased (Tr. 24, 228).  Treatment notes from April 12, 1999 indicate that plaintiff's depression was unchanged (Tr. 227).  Plaintiff's treating physician treated her symptoms with medication, but apparently never referred her for more aggressive mental health counseling or medical treatment by a psychiatrist or hospital.

Plaintiff testified that she used to weigh 152 pounds and at the time of the hearing, she weighed 255 pounds (Tr. 23, 521).  Record evidence indicates that plaintiff reported a 75-80 pound weight gain since moving from Florida in 1997 (Tr. 23, 521).  Medical evidence includes diagnoses of obesity (Tr. 224, 225, 227, 230).  The medical evidence also reveals that plaintiff refused dietary consult in January 2001 (Tr. 224).

6

Plaintiff testified that she had bowel control problems related to anal fissure surgery (Tr. 23, 520). She had this surgery in 1999, and follow up records from treating sources do not reveal any ongoing problems through plaintiff's date last insured, December 31, 2000 (Tr. 22-23, 175-181, 222-25, 254-55).

Plaintiff further testified to the limiting effects of each of her impairments, and testified that she has not been able to clean her house for "about three or four years" prior to the date of her hearing, February 10, 2004 (Tr. 524). She testified that "[i]f I sit on the couch and don't do nothing but watch TV I'm kind of all right. But if I get up and do anything I get sick." (Tr. 524). She testified that during the period prior to December 2000, one of her daughters-in-law did most of the work around plaintiff's house (Tr. 525). Plaintiff's daughter-in-law agreed with plaintiff's testimony concerning her condition and abilities during the relevant period (Tr. 526-28).

The VE testified that plaintiff's past relevant work as a hairstylist was light and semi-skilled, with skills that do not transfer to other work (Tr. 529). In response to the ALJ's hypothetical question which incorporated plaintiff's vocational profile, including her exertional and nonexertional impairments resulting in her limitation to light work not involving excessive stress, frequent bending and stooping, or excessive vibration, the VE was able to identify light and sedentary jobs in six

7

occupations which the hypothetical individual could perform (Tr.
530-31). The VE further testified that these jobs would not be
affected by an inability to work at heights or around moving and
dangerous machinery, or an inability to handle frequent contact
with the general public (Tr. 531). He further testified that the
identified jobs would not be affected by an inability to handle
more than simple job instructions, and inability to perform
frequent squatting, or an inability to operate foot controls on a
frequent basis (Tr. 532). One of the identified occupations
would be affected by exposure to dust, but none would be affected
by an inability to perform frequent overhead motions, a mild
decrease of hand grip, or a mild restriction of bilateral manual
dexterity (Tr. 532-33). However, the inability to perform
prolonged handwriting would eliminate all of the identified light
occupations, and one of the three sedentary occupations
(addresser) (Tr. 533-34). The requirement of a sit/stand option
would also eliminate the addresser occupation, but not the other
two sedentary occupations (Tr. 534). The VE further testified
that none of the identified occupations would be affected by mild
or moderate levels of pain and/or fatigue (Tr. 534-35). Finally,
he testified that plaintiff's past relevant work would be
precluded by the limitation against exposure to excessive stress
(Tr. 534), and that all work would be precluded if her testimony
and that of her daughter-in-law were deemed fully credible (Tr.

8

535-36).

### III. Conclusions of Law

#### A. Standard of Review

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process. Jones v. Secretary, 945 F.2d 1365, 1369 (6th Cir. 1991). The purpose of this review is to determine (1) whether substantial evidence exists in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision. Landsaw v. Secretary, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion." Her v. Commissioner, 203 F.3d 388, 389 (6th Cir. 1999)(citing Richardson v. Perales, 402 U.S. 389, 401 (1971)). It has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance." Bell v. Commissioner, 105 F.3d 244, 245 (6th Cir. 1996). Even if the evidence could also support a different conclusion, the decision of the ALJ must stand if substantial evidence supports the conclusion reached. Her, 203 F.3d at 389 (citing Key v. Callahan, 109 F.3d 270, 273 (6th Cir. 1997)). However, if the record was not considered as a whole, the Commissioner's conclusion is undermined. Hurst v.

9

<u>Secretary</u>, 753 F.2d 517, 519 (6th Cir. 1985).

        B.  <u>Proceedings at the Administrative Level</u>

        The claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). At the administrative level of review, the claimant's case is considered under a five-step sequential evaluation process, as follows:

(1)  If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.

(2)  If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.

(3)  If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the "listed" impairments[1] or its equivalent; if a listing is met or equaled, benefits are owing without further inquiry.

(4)  If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (e.g., what the claimant can still do despite his or her limitations); by showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a <u>prima facie</u> case of disability.

(5)  Once the claimant establishes a <u>prima facie</u> case of disability, it becomes the Commissioner's burden to establish the claimant's ability to work by proving the existence of a significant number of jobs in the national

_____

[1] The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, Appendix 1.

economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

_Moon v. Sullivan_, 923 F.2d 1175, 1181 (6th Cir. 1990).

The Commissioner's burden at the fifth step of the evaluation process can be carried by relying on the medical-vocational guidelines, otherwise known as "the grid," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. Otherwise, the grid can not be used to direct a conclusion, but only as a guide to the disability determination. _Id._ In such cases where the grids do not direct a conclusion as to the claimant's disability, the Commissioner must rebut the claimant's _prima facie_ case by coming forward with particularized proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert (VE) testimony. _See Varley v. Secretary_, 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity (RFC) for purposes of the analysis required at steps four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere. _See_ 42 U.S.C. § 423(d)(2)(B).

11

C. <u>Plaintiff's Statement of Errors</u>

Plaintiff alleges error in the ALJ's failure to: (1) properly evaluate her complaints of pain; (2) consider her impairments in combination; and (3) fully credit her testimony. Plaintiff further argues that the ALJ erred in using a framework of Medical-Vocational guidelines to direct his decision, and in finding that a significant number of jobs which plaintiff could perform existed in the regional economy. As explained below, the undersigned does not find error in any of these particulars, except in the ALJ's failure to account for the restrictions associated with plaintiff's carpal tunnel syndrome; however, that error is harmless in light of the vocational expert testimony at the hearing.

The recurring theme of the ALJ's decision and the Commissioner's brief is that the period under consideration is limited to the time between August 30, 1997, and December 31, 2000, during which time no treating or examining source opined that plaintiff was disabled or even functionally limited by her impairments, nor did it appear that any of her impairments were refractory to treatment. The ALJ considered the evidence of plaintiff's obesity, CTS, orthopedic impairments, chest pains, breathing problems, depression and anxiety, and found that these conditions resulted in plaintiff's limitation to "light exertional activity without frequent bending and stooping and

which would not involve excessive stress." (Tr. 25, 27).
Notably absent from this determination are any manipulative
restrictions, despite the fact that electromyography and nerve
conduction studies done during the relevant period, on June 20,
2000, revealed "moderately severe median nerve entrapment at the
right wrist and mild median nerve entrapment at the left wrist."
(Tr. 252).

Also in June 2000, Dr. James McKinney, an orthopedic
surgeon, diagnosed bilateral CTS, right greater than left, after
observing a positive Tinel's sign and positive Phalen's sign on
the right wrist, as well as a positive Phalen's sign on the left
wrist (Tr. 253). Dr. McKinney also noted that plaintiff had
"EMG's done in the past years ago and these were read as showing
mild carpal tunnel syndrome even back then." (Id.). Indeed, Dr.
Vossel had noted positive Tinel's sign bilaterally on April 12,
1999, corresponding with his notation that plaintiff complained
of more recently experiencing increased numbness and weakness in
her hands (Tr. 227); he also noted increased CTS problems in
October 1999 (Tr. 225). It was also noted by Dr. McKinney in
June 2000 that plaintiff's CTS "symptomatology [(numbness and
tingling in the hands)] has been complicated by the fact that she
was involved in an injury or accident in which she suffered a
whiplash type injury about 3 ½ years ago." (Id.). The medical
records do not reflect that plaintiff was ever referred for

13

carpal tunnel release surgery, and neither Dr. McKinney nor any other examining source has assessed any work-related limitations resulting from this condition; the ALJ discounted the effects of plaintiff's CTS on this basis, finding that "the evidence fails to support a disabling impairment..." (Tr. 23).

However, while the evidence may not support a disabling level of impairment, it does support some degree of impairment. It is clear that plaintiff's failure to pursue surgical intervention does not necessarily mean that her CTS symptoms were adequately controlled, nor can it be held against her when, as she argues in her brief, there is no evidence that such surgery would necessarily reduce or eliminate her symptoms. See Fraley v. Sec'y of Health & Human Svcs., 733 F.2d 437, 440 (6th Cir. 1984). It is quite possible that surgery was not recommended because of the complicating effects of the "whiplash type injury" referenced by Dr. McKinney. Moreover, the failure of any source to assign specific, work-related manipulative restrictions does not justify the ALJ's refusal to recognize the existence of same, in view of the uncontroverted evidence of the extent of plaintiff's CTS. The medical test results showed moderately severe nerve entrapment; "moderately severe" is a rating which in agency parlance is often viewed as prohibitive of work,[2] as it

---

[2] McLean v. Comm'r of Soc. Sec., 360 F.Supp.2d 864, 870 (E.D. Mich. 2005)("moderately severe" defined by counsel as indicating "an impairment which seriously and significantly interferes with the ability to perform basic work activities..."); Bergfeld v. Barnhart, 361 F.Supp.2d 1102, 1108 n.2 (D.

14

was by the VE in this case when the ALJ asked him to consider a level of pain and/or fatigue "ranging from moderately severe to a severe degree" (Tr. 534-35). These test results were confirmed by medical signs and plaintiff's subjective report of symptoms, as well as the statements of third-party witnesses in support of plaintiff's disability application, who identified her hand problems as prominent among her impairments (Tr. 113-148). Plaintiff is right-handed (Tr. 519), reported that a two-page agency questionnaire took her two days to complete (Tr. 112), and elsewhere reported and testified to having difficulty with writing and maneuvers involved with being a hairstylist (Tr. 149, 519). Thus, it appears as though the medical and testimonial evidence establishes that, during her insured period,[3] plaintiff

---

Ariz. 2005)(RFC form defined "moderately severe" as indicating "an impairment which seriously affects ability to function"); Camara v. Barnhart, 2005 WL 3434034, *1 (D. Mass. Dec. 13, 2005)(VE testified that "moderately severe" limitations precluded work.

[3]Defendant contends that, in addition to the fact that only conservative treatment of plaintiff's CTS was prescribed, "a consultative examination in 2002 revealed negative Tinel's and Phalen's signs bilaterally. Presumably, if Plaintiff's CTS were as severe as she claimed, the Tinel's and Phalen's signs would not have returned negative upon later examination." (Docket Entry No. 22, p. 10). Of course, in dealing with the issue of whether objective medical evidence supports plaintiff's subjective pain complaints, defendant attempts to refute the value of a piece of radiographic evidence revealing cervical disc bulges and degenerative disc disease by arguing that this "magnetic resonance imaging occurred in 2003, well beyond the expiration of her insured status and, therefore, is not relevant to the time period at issue." (Id. at p. 8). The Commissioner cannot have it both ways. In terms of evidentiary value, the absence of Tinel's and Phalen's signs nearly two years after the expiration of plaintiff's insured period does not significantly detract from the presence of such signs during the insured period. The condition of plaintiff's hands in the years after the expiration of her insured status is difficult to ascertain, given the absence of medical signs of CTS and a hospital notation from January 2002 which does not even mention CTS in discussing plaintiff's medical history, and even states that plaintiff "is able to move all four extremities purposefully [and] ... is routinely up,

had moderately severe CTS in her right (dominant) hand, and that the resulting numbness and tingling compromised to some extent her ability to write, among other things.

This is significant because the VE testified that while the light and sedentary jobs which he identified (and upon which the ALJ relied) would accommodate the effects of mild loss of grip strength and bilateral manual dexterity, the inability to perform prolonged handwriting would eliminate all but two of the jobs identified (Tr. 533-34). Certainly, the relevant medical and testimonial evidence supports a restriction against *prolonged* handwriting.[4] Though impelled by this evidence to ask the question, the ALJ avoided the VE's answer by refusing to assign such a restriction. The record does not substantially support this refusal.

---

about and able to perform all her own ADL's" (Tr. 269), versus the testimonial evidence to the contrary and the notation of the government worker who interviewed plaintiff in association with her disability report in July 2002, noting that plaintiff's hands were swollen, and that she "tried to avoid laying them down" and "had a hard time signing her name and moving any papers around with her hands." (Tr. 89).

[4]The undersigned views this restriction against prolonged handwriting as commensurate with the other hypothetical manual limitations at the mild level. Whatever the intersection between the legal and medical definitions of "moderately severe," the ALJ was justified in concluding that the limiting effects from plaintiff's moderately severe CTS were only mild (and thus inconsequential per the testimony of the VE, except to the extent that prolonged handwriting is precluded), in light of the sparse medical records and the absence of anything more than conservative treatment, including plaintiff's self-prescribed use of ibuprofen and wrist splints (Tr. 253). Though the regulations state that a finding of the ability to do light work will also represent a finding of ability to do sedentary work "unless there are additional limiting factors such as loss of fine dexterity...," 20 C.F.R. § 404.1567(b), the VE here testified that mild loss of bilateral manual dexterity would not preclude the sedentary jobs he identified (Tr. 533).

16

However, according to the VE, the remaining two sedentary jobs -- table worker and bench assembler -- exist in numbers totaling 4,709 in the local economy and 141,746 in the national economy (Tr. 531). Such numbers are indisputably significant. See, e.g., Wright v. Massanari, 321 F.3d 611 (6th Cir. 2003)(affirming step five finding of significant number of other jobs based on VE testimony identifying two occupations totaling 3,900 jobs in state economy)(citing Braden v. Sec'y of Health & Human Svcs., 1990 WL 177211 (6th Cir. Nov. 14, 1990)(affirming ALJ finding that two occupations totaling 4,000 jobs in regional economy was a significant number of jobs)); Stewart v. Sullivan, 1990 WL 75248 (6th Cir. June 6, 1990)(125 jobs in the local area is a significant number of jobs). Accordingly, the ALJ's failure to incorporate the restriction against prolonged handwriting was harmless error. Cf. Martin v. Comm'r of Soc. Sec., 2006 WL 509393, **5 (6th Cir. Mar. 1, 2006)(finding that even if the ALJ should have excluded two of the three occupations identified by the VE, the remaining occupation totaling 870 regional jobs would constitute a significant number of jobs).

In all other respects, the undersigned must conclude that the ALJ's decision is substantially supported. During the limited period at issue in this case, plaintiff's medically determinable impairments, though severe, were not shown to be

17

severe enough to undermine the ALJ's finding of plaintiff's residual functional capacity. As noted above, none of plaintiff's treating sources completed an RFC assessment form, opined that she was disabled, or otherwise indicated that her several impairments were unresponsive to treatment measures. As noted by the ALJ, the objective studies of plaintiff's cardiopulmonary symptoms yielded findings that were normal or only minimally abnormal (Tr. 182, 208, 215-16, 217-19, 296), and her orthopedic problems -- including cervical strain (Tr. 225) and low back pain (Tr. 196) -- apparently resolved with treatment. Her depression and anxiety were treated by her regular physician, with no indication of any exacerbations during her insured period requiring more aggressive psychiatric treatment. While these impairments were taken up by the ALJ one at a time, there is no indication (other than as discussed above regarding plaintiff's CTS) that he failed to consider their effects in combination when he determined plaintiff's RFC for "light exertional activity without frequent bending and stooping and which would not involve excessive stress." (Tr. 25).

While plaintiff cites Social Security Ruling 02-1p as providing that obesity in combination with other impairments may justify a finding of medical equivalence to a listed impairment, she fails to identify any particular listing that may have been equaled. Moreover, while plaintiff argues that the ALJ

18

improperly "took the plaintiff to task about her obesity by saying, '[S]he does have a history of morbid obesity but apparently has not aggressively pursued any weight loss program'" (Docket Entry No. 17, p. 9), the undersigned would note that there is evidence in the record showing that plaintiff has had success in the past with a prescription weight loss drug, losing 65 pounds (Tr. 230), though she has not pursued similar treatment measures or otherwise apparently endeavored to lose weight since discontinuing that drug. She expressed interest in a fat-blocking drug to Dr. Louis F. Vossel at an office visit on October 15, 1999, and a prescription was written (Tr. 225), but there is no further mention of that prescription or any weight loss in follow up. An office note by Dr. Vossel dated December 29, 2000, bears a handwritten notation dated January 3, 2001, indicating that plaintiff refused dietary consult (Tr. 224). As plaintiff herself notes, "[t]here is no evidence in the record if the plaintiff lost her gained weight that this would change any of her conditions." (Docket Entry No. 17, p. 9).

The undersigned must conclude that the ALJ properly identified plaintiff's severe impairments; considered them in combination when determining that they were not of listing-level severity, but severe enough to limit her to a restricted range of light work; and properly found plaintiff less than fully credible in light of the lack of objective medical support for her

19

subjective complaints and the attenuation between the period prior to December 31, 2000, and much of the testimonial and documentary evidence which plaintiff submits in support of her application.  As referenced above, while the medical record contains some few indications of pain associated with plaintiff's anal fissure, pain in her cervical and lumbar spine, chest pain, and CTS-related pain, the record as a whole -- pertaining to the relevant time period -- simply does not corroborate her assertion of continuous, intractable, disabling symptoms which cannot be controlled by medication or other measures.  "The absence of sufficient objective medical evidence makes credibility a particularly relevant issue, and in such circumstances, this court will generally defer to the Commissioner's assessment when it is supported by an adequate basis."  <u>Walters v. Comm'r of Soc. Sec.</u>, 127 F.3d 525, 531 (6th Cir. 1997)(<u>citing</u> <u>Blacha v. Sec'y of Health & Human Svcs.</u>, 927 F.2d 228, 230 (6th Cir. 1990)).  The ALJ's credibility finding is to be accorded "great weight and deference," <u>Jones v. Comm'r of Soc. Sec.</u>, 336 F.3d 469, 476 (6th Cir. 2003), and the undersigned concludes that it cannot be set aside on the record before this Court.

As noted by the Commissioner in her brief, plaintiff's argument concerning the ALJ's application of the grid is unavailing, as the ALJ merely used the grid as a framework for decision-making, rather than relying exclusively on the grid as a

20

shortcut eliminating the need to elicit vocational expert testimony.  Wilson v. Comm'r of Soc. Sec., 378 F.3d 541, 548 (6th Cir. 2004).  While the ALJ's findings do mistakenly cite the framework he employed as "direct[ing]" a finding of non-disability, rather than as suggesting the existence of a significant number of available jobs (Tr. 26, 27), the body of his decision clearly reflects that he relied upon VE testimony and not solely upon the cited framework of grid rules (Tr. 26). However, inasmuch as there might appear to be some ambiguity in the matter of what good evidence the Commissioner relied upon to carry her step five burden, the undersigned concludes that the decision should be modified[5] to reflect a finding of ability to perform a significant number of other jobs based upon the VE's testimony to the existence of such jobs in the local economy as table worker and bench assembler, as well as the framework of applicable grid rules.

While plaintiff further argues that the ALJ failed to consider that she lives in a rural area and the jobs identified by the VE are concentrated in the surrounding metropolitan areas some 40+ miles away, the distance of plaintiff's commute, in and of itself, is not relevant to the disability analysis.  Harmon v. Apfel, 168 F.3d 289, 292-93 (6th Cir. 1999).  Rather, this factor

---

[5]42 U.S.C. §405(g) provides that "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."

Case 2:05-cv-00063   Document 23   Filed 07/18/06   Page 21 of 24 PageID #: 88

is only relevant to the extent that the identified jobs exist in such limited numbers and at such a distance outside of the region where plaintiff lives as to be considered "isolated."[6]  Id.; 20 C.F.R. § 404.1566(b).  The regulations provide that a significant number of jobs may be shown by reference to "the region where you live or ... several other regions of the country," without regard to whether such jobs exist "in the immediate area in which you live..."  20 C.F.R. § 404.1566(a).  There is simply no indication on this record that the jobs of table worker and bench assembler are concentrated in a few areas outside of the region of plaintiff's residence; indeed, plaintiff would appear to concede that such jobs are generally available in any metropolitan area, including several such areas in the region -- if not the immediate area -- of her residence.  (See Docket Entry No. 17, p. 12).  Accordingly, the undersigned concludes that the ALJ did not err in his treatment of the vocational proof.

In sum, the undersigned finds substantial evidence

---

[6]The Sixth Circuit in Harmon cites the language from Hall v. Bowen, 837 F.2d 272, 275 (6th Cir. 1988), which plaintiff here relies on:

A judge should consider many criteria in determining whether work exists in significant numbers, some of which may include: ... the distance the claimant is capable of traveling to engage in the assigned work; the isolated nature of the jobs; the types and availability of such work, and so on.

However, the Harmon court further found as follows: "Hall went on to state that these factors were suggestions only - the ALJ need not explicitly consider each factor.  The [Social Security] Act, its legislative history and the regulations make it clear that the test is whether work exists in the national economy, not in plaintiff's neighborhood."  168 F.3d at 292.

supporting the Commissioner's ultimate conclusion in this case, and must therefore recommend that her decision be affirmed as modified.

## IV. Recommendation

In light of the foregoing, the Magistrate Judge recommends that plaintiff's motion for judgment on the administrative record be DENIED; that the decision of the Commissioner be MODIFIED to reflect a finding of "not disabled" based upon the testimony of the vocational expert and the framework of Medical-Vocational rules 202.14 and 202.21; and that the Commissioner's decision be AFFIRMED as modified.

Any party has ten (10) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court. Any party opposing said objections shall have ten (10) days from receipt of any objections filed in which to file any responses to said objections. Failure to file specific objections within ten (10) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. Thomas v. Arn, 474 U.S. 140 (1985); Cowherd v. Million, 380 F.3d 909, 912 (6th Cir. 2004)(en banc).

**ENTERED** this 18th day of July, 2006.

_/s/ Joe B. Brown_____
JOE B. BROWN
United States Magistrate Judge

24